**IN THE COURT OF APPEALS OF IOWA**

No. 22-1180
Filed September 21, 2022

**IN THE INTEREST OF J.T.,**
**Minor Child,**

**J.T., Father,**
　　Appellant.

_____

　　Appeal from the Iowa District Court for Benton County, Cynthia S. Finley, District Associate Judge.

　　A father appeals the termination of his parental rights. **AFFIRMED.**

　　David R. Fiester, Cedar Rapids, for appellant father.

　　Thomas J. Miller, Attorney General, and Tabitha J. Gardner, Assistant Attorney General, for appellee State.

　　Annette Martin, Cedar Rapids, attorney and guardian ad litem for minor child.

　　Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

J.T. is the father of a child born in 2018. The Iowa Department of Health Human Services (DHHS) first became involved with the family in 2018 when the child tested positive for methamphetamine at birth and was adjudicated a child in need of assistance (CINA). He was returned to the mother[1] in July 2019 and the CINA case was closed by September 2020. Even after the child was returned to the mother, she would become overwhelmed and leave the child with the foster parents the child had stayed with during the CINA adjudication. Notably, the child was with his former foster family for the majority of November 2020, when the father was facing felony charges for operating while intoxicated and eluding.

In December 2020, DHHS received notice of an allegation the parents were again using methamphetamine; both the mother and father admitted to using while caring for the child, and their use was confirmed by positive drug tests. Due to this development, the child was formally removed from the parents' custody in January 2021 and once again adjudicated CINA. The father began a prison sentence that same month and remained incarcerated until October, when he moved into a halfway house until December. That same month, he moved in with his mother—the paternal grandmother—and was granted unsupervised visits with the child. A DHHS report lauded the father, saying he "accomplished more in the week he ha[d] been released than a lot of people in his situation would have." But, the guardian ad litem (GAL) had concerns with starting the father at unsupervised visits when he had never cared for the child alone before and did not have a driver's license,

---

[1] The mother of the child also had her parental rights terminated; she is not party to this appeal.

preventing him from transporting the child in the case of an emergency. With no provider assessment of his parenting and taking these concerns into consideration, the father's visits were changed to semi-supervised.

To assure successful reunification, DHS required drug testing of the father because of his previous use of illegal drugs. In the first half of 2022, the father missed eleven of twenty-three requested drug tests. At the time, the caseworker testified the father missed tests without explanation, though the father testified at the termination hearing he missed tests because of a health condition[2] and work schedule. In May, he removed one patch in frustration; that same month, he claimed a second had been damaged by a screw, but still provided it for testing—it came back positive for methamphetamine, a result the father testified he had not yet reported to his probation officer.[3] Visits became fully supervised.

The father secured an apartment in early 2022 and had the paternal grandmother living with him while she looked for her own place—as the father still did not have a driver's license, she provided all of his transportation. To his credit, the father maintained the same employment since his release from prison, though he was just ending his seven-week medical leave of absence from work at the time of the termination hearing. He began participating in Safe Care services to assist with managing some of the child's more challenging behaviors and largely complied with attending mental-health and substance-abuse counselling. He

---

[2] The father suffers from vertigo. He described the condition as debilitating, making him "lightheaded, dizzy, [and] off balance." But, the father testified, with medication and physical therapy his symptoms had much improved.

[3] The father claimed the test was positive because he took pseudoephedrine and an inhaler, which the case worker testified should not have triggered a positive methamphetamine result.

missed a number of visits, often citing his continuing health concerns and a bout of COVID—more than once cancelling with only ten minutes of notice. And, when he did have visitation, he relied heavily on the paternal grandmother to attend to the child and would call the foster family to ask basic parenting questions such as if the child was hungry or needed a bath. In discussing the father's visitation, the DHHS caseworker testified about one specific visit:

> [The father] said something about giving [the child] a timeout, but didn't give him a timeout. So then I reminded him that it doesn't work if we don't follow through. And he said something to the effect of, but that is a lot of work. And I responded with something like, parenting is a lot of work.

By all reports, the child is doing well in his foster home, where he had been for over half his life, and is bonded with both his foster parents and foster brother. This is a pre-adoptive home. Still, the child has some speech delays that make it difficult to communicate. The child seemed overwhelmed by having to go back and forth between his foster home and visits with the father. During this instability, the child exhibited challenging behaviors that the father testified were "unsettling." The child has also been diagnosed with some mental-health conditions, including separation anxiety when his foster mother "drops him off at school, moves to another room in the house . . . , and in the middle of the night." And, the child has physical conditions that have already required surgery and might need further medical intervention in the future. The foster parents consistently made medical appointments and preschool arrangements for the child without assistance from the father.

A petition to terminate parental rights was filed in February 2022. A hearing was held that June, the day before the child's fourth birthday. Both DHS and the

child's GAL recommended termination, and the court took judicial notice of the underlying CINA action. Ultimately, the court terminated the father's rights under Iowa Code section 232.116(1)(h) (2022), which allows a court to terminate parental rights if it finds:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The father challenges only the fourth element, whether the child could be returned to his custody at the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (defining "the present time" as the time of the termination hearing). We review challenges to the termination of parental rights de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

The father points to the progress he made after his incarceration, including finding employment, housing, and working on the Safe Care curriculum. Still, given the positive methamphetamine test compounded with the large proportion of missed drug tests in the months leading up to the termination hearing, concerns about the father's sobriety persist. *See In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) ("[A] juvenile court could reasonably determine that a parent's active addiction to methamphetamine is 'imminently likely' to result in harmful effects to the physical, mental, or social wellbeing of the children in the parent's care."); *see also In re D.G.*, No. 20-0587, 2020 WL 4499773, at *4 (Iowa Ct. App. Aug. 5, 2020)

(acknowledging the presumption that a missed test would be positive). Further, the father has never been the custodial parent of the child and has not demonstrated an ability to take on the child's full-time care. He justifies his regular reliance on the foster family for tips on basic parenting skills and to make all of the child's appointments by explaining that being an involved parent is new to him; but, "[c]hildren simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). We will not force the child to forego permanency in the hopes the father can catch up. *See D.W.*, 791 N.W.2d at 707 ("While this evidence provides some hope [the parent] might eventually be able to parent [the child] safely and consistently in her home, our legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests."). We agree with the juvenile court that there was clear and convincing evidence that grounds for termination under section 232.116(1)(h) exist.

The father also argues termination is not in the child's best interests because the strength of the bond between he and the child outweighs the need for termination. *See* Iowa Code § 232.116(3)(c) (allowing the court the discretion not to terminate if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). As a starting point, this is a discretionary exception rather than mandatory. *In re A.S.*, 906 N.W.2d 467, 475 (Iowa 2018). And, "once the State has prove[d] a ground for termination, the parent resisting termination bears the burden to establish an exception to termination." *Id.* at 476. Here, the evidence

does not support that the bond between the child and the father is so strong as to overcome the need for termination. The father admitted at the termination hearing that, because he was not around much when the child was younger, their bond is fairly recent. While the child loves his father and enjoys spending time with him, he has developed a fierce attachment to his foster family. So, the father has not proven that termination will be detrimental to the child.

Insofar as the father is arguing on appeal that the State failed to make reasonable efforts toward reunification or that he should have been granted additional time for reunification, we note we cannot address the issues raised for the first time on appeal. *See In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017) ("[P]arents have a responsibility to object when they claim the nature or extent of services is inadequate. . . . 'In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding.'"); *see In re T.W.*, No. 20-0145, 2020 WL 1881115, at *4 n.8 (Iowa Ct. App. Apr. 15, 2020) ("A parent cannot request additional time to work toward reunification for the first time on appeal."). So, we do not discuss these issues further.

Because the State established the grounds for termination, the strength of the bond between the father and the child does not outweigh the need for termination, and the father cannot raise issues of reasonable efforts and additional time for the first time on appeal, we affirm the juvenile court's termination of the father's parental rights.

**AFFIRMED.**